DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| David White, et al., | ) | |
| | ) | CASE NO. 5:09 CV 2193 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION AND |
| | ) | PRELIMINARY INJUNCTION ORDER |
| Beacon Journal Publishing Company, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs are retired employees (and their spouses) of defendant Akron Beacon Journal

Publishing Company (Journal) who, during their employment with the Beacon, were members of

the Communications Workers of America, Local 14514, aka Akron Typographical Union No.

182 (Union).[1]  In their first amended complaint (ECF 74),[2] plaintiffs allege that they, and

similarly situated members of the Union, gave up their right to lifetime employment with the

Journal in exchange for retiring early with certain vested lifetime healthcare benefits for

themselves and their spouses.  Plaintiffs further allege that defendants have unilaterally

terminated such vested benefits in violation of Section 301 of the Labor Management Relations

Act (LMRA), 29 U.S.C. § 185(a); Sections 502(a)(1)(B) and (a)(3) of the Employment

Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3), as well as 29

U.S.C. § 1140, and various common law causes of action, including estoppel.

---

[1] The Union was voluntarily dismissed as a plaintiff in this action.  ECF 67 and 69.

[2]  The first amended complaint is styled as a class action complaint.  The following plaintiffs were added in the amended complaint: Robert Abbott; Robert Walker; Larnie and Stephanie Greene; Ora and Shirley Thombs; and Raymond and Amaryllis Wolfe.  The following defendants were added in the amended complaint: Beacon Journal Retiree Welfare Benefit Plan; Sound Publishing, Inc.; Black Press, Ltd.; and John and Jane Does.  However, a motion for class certification has not yet been filed.

(5:09 CV 2193)

Plaintiffs have moved for a preliminary injunction requesting that defendants be required to restore their retiree healthcare benefits.  ECF 4.  Defendants have opposed the motion (ECF 34), and plaintiffs, in reply, filed a supplement to the motion for preliminary injunction (ECF 36).

The Court conducted a hearing on plaintiffs' motion for injunctive relief, and plaintiffs subsequently filed a proposed order providing injunctive relief (ECF 42 and 45) and notified the Court that the parties had agreed to pursue private mediation.  ECF 43.  Defendants requested and received leave to defer their response to plaintiffs' proposed preliminary injunction order until seven (7) days after mediation was completed.  ECF 44 and 47.

The Court granted multiple requests for extensions of time in which to complete mediation.  However, the parties were not able to resolve the case and defendants filed their response to plaintiffs' proposed preliminary injunction order.  ECF 66.  Plaintiffs filed a reply (ECF 73), which included a revised proposed preliminary injunction order.  No response has been filed to the revised proposed order.[3]

For the reasons contained herein, the motion for a preliminary injunction as to the named plaintiffs is GRANTED.

## I.  FINDINGS OF FACT

After considering the affidavits, declarations, depositions, and documents attached thereto, and the hearing on the plaintiffs' motion for injunctive relief, the Court makes the findings of fact which follow for the purposes of ruling on plaintiffs' motion for injunctive relief.

---

[3] All of the parties' briefing regarding plaintiffs' motion for preliminary injunction took place before plaintiffs' amended complaint was filed.

2

(5:09 CV 2193)

All of the Court's findings of fact are based on the affidavits, declarations, depositions and documents attached thereto provided in connection with the pleadings and briefs in this case, and the preliminary injunction hearing.  Any conclusion of law that may be construed to include a finding of fact is hereby adopted as a finding of fact.

The Court's use of subheadings is for convenience only.  If a finding of fact or conclusion of law is pertinent to any other finding of fact or conclusion of law contained herein other than that indicated by the heading under which it appears, that finding or conclusion is adopted as a finding or conclusion applicable to such other determinations as may be appropriate.

A.      Parties

1.      The Akron Beacon Journal is a regional newspaper based in Akron, Ohio.  Defendant Journal is a subsidiary of defendant Sound Publishing, Inc. (Sound), which is a subsidiary of defendant Black Press, Ltd. (Black Press), whose principal shareholder is defendant David Holmes Black (Black).

2.      The plaintiffs are retired employees[4] of the Journal, and their spouses.

B.      Collective Bargaining Agreements and Job Security Agreements

1.      The retired plaintiff employees were members of the Union, which negotiated collective bargaining agreements (CBA) with the Journal.

2.      Two of these CBA's are presently at issue in this case: the CBA with the Akron Typographical Union No. 182 effective December 1, 1984 through November 30, 1987, and the

---

[4] The retirement dates of these employees range from 1990 to 2001: White - 2/2/87; Downing - 2/1/01; West - 7/31/01; Abbott - 2001; Walker - 2001; Greene - 2001; Thombs - 1997; Wolfe - 1990.

(5:09 CV 2193)

CBA effective October 1, 1992 - September 30, 2003.[5]  ECF 34-11, 34-12 and 34-13.  Both

CBA's address health benefit coverage and retirement.

<u>1984-1987 CBA</u>

3.　　In the 1984-1987 CBA, Article IV provides for medical benefits and Article XI provides

for retirement incentives.

> Article IV-Hospitalization, Life Insurance:
> 　. . . .
> Widows of active and retired employees who have 10 years of service shall
> be provided hospitalization for five years following death or until remarriage,
> whichever comes first.
> . . . .
> Pensioned employees of the Beacon Journal will be provided with group
> hospital-medical and life insurance to the extent in effect at the time of retirement.
>
> Article IX-Retirement Incentives:
> 　. . . .
> 　. . . Hospitalization (including major medical coverage to age 65) and life
> insurance coverage (reduced 50% at retirement) continue as outlined in
> Article IV.

*See* ECF 34-12.

4.　　These sections link retiree health benefits to pension status.  While the 1984-1987 CBA

provides that pensioners and their widowed spouses "will be provided" with hospital-medical

benefits in effect at the time of retirement, and that certain medical benefits "continue" to age 65

and beyond, the CBA itself does not contain the specifics of the health benefits coverage which

will be provided or continued.  Further, the language regarding health care benefits for

---

[5] Raymond Wolfe, who was added as a plaintiff in the second amended complaint, retired in 1990.  It is
unclear whether either of these CBA's apply to his retirement, however, the Summary Plan Description applicable to
the other plaintiff retirees is applicable to Wolfe as well.

4

(5:09 CV 2193)

"pensioned employees" in Article IV is different from the language in Article IX regarding the

continuation of health care coverage, which ultimately refers bact to Article IV.  Lastly, the CBA

does not contain specific language that limits retiree health benefits to the duration of the

contract and does not contain a reservation of rights clause regarding retiree benefits.

<u>1992-2003 CBA</u>

5.      In the 1992-2003 CBA, Article XXII provides for health benefits, including retirement

health benefits.

Article XXII-Hospitalization, Life Insurance:

. . . .

(b) Employees who retire between October 1, 1992 and September 30, 1993 will
be provided with group hospital-medical and life insurance to the extent in
existence on December 31, 1991.
. . . .

(d) Effective on or after October 1, 1993, the Employer may make any
changes at any time to the Plan that it deems necessary or
appropriate without further negotiations with the Union including,
without limitation for current employees, future retirees, or both,
changes in carriers, plan coverage, eligibility requirements and in
the contribution rates which it has made in groups, health and
accident, and hospitalization insurance coverage, including dental
coverage, for the majority of full-time, union-represented
employees in the following bargaining units (whether or not such
employees are participants in the Plan or in another such benefit
program sponsored by the Employer: newsroom, maintenance,
engravers, pressmen, paperhandlers, mailroom, district
managers/drivers[)].  Accordingly, the Employer may increase the
rate of contribution above the 15% presently required: provided,
however, that the Plan shall provide substantially equivalent
coverage at no greater cost for comparable options than provided
for the majority of the full-time, union-represented employees in the
specified bargaining units above.
. . . .

5

(5:09 CV 2193)

> (f) Widows of active and retired employees who have then (10) years service shall
> be provided with hospitalization for five (5) years following death or until
> remarriage whichever comes first.  This benefit continues through September 30,
> 1994.  After September 30, 1994, only employees on the job security roster who
> have retired prior to October 1, 1994 shall continue to receive this benefit.

*See* ECF 34-13.

6.      This section links retiree health benefits status to retirement status.  The 1992-2003

CBA states that retirees "will be provided" with hospital-medical benefits in effect on December

31, 1991, but the CBA does not contain any specifics regarding that coverage.  Article XXII

reserves defendants' rights to change the plan for current employees and future retirees,

however, it is unclear whether this language includes the right to change retirement health

benefits available to future retirees, or to change the health retirement benefits of future retirees

after retirement, or both.  Further, the CBA does not contain specific language that limits retiree

health benefits to the duration of that agreement.

          Job Security Agreements

7.      In addition to the CBA's, the Union and Journal entered into memorandums of

understanding entitled "Job Security Agreements."  The Job Security Agreements state in

relevant part as follows:

> The Company guarantees employment, regardless of a decline in business
> or further automation, to each named individual on the Job Security Roster
> attached hereto, until such employee dies, resigns, retires or is discharged
> for cause.

8.      The Job Security Rosters attached to the two CBA's referenced above list the all of the

now retired plaintiff employees.  ECF 34-12, p. 21 of 21; ECF 34-13, p. 18 of 23.

6

(5:09 CV 2193)

C.      Summary Plan Description

1.      The Summary Plan Description in effect as of February 1, 1987 described the health

benefit plan for active employees and for employees who retired on or after February 1, 1978.

ECF 34-16 at p. 1.[6]  This is the most recent Summary Plan Description (SPD) identified by the

Journal's General Counsel and, based on its effective date of February 1, 1987, is the SPD

applicable to the named plaintiff retirees.  *See* ECF 34-11, par. 8.  The SPD describes the

specifics of health benefits applicable to employees and retirees.

2.      Subject to certain limitations,[7] the February 1, 1987 SPD expressly provides for a

prescription copay as follows:

> Prescription Drug Benefit
>
> The benefit pays for Prescription Drugs ordered in writing by a physician.
> They must be needed for treatment of you or your Dependent because of
> accidental injury, sickness, or pregnancy.  There is a Cash Deductible of
> $2.00 for this benefit.  (If you retired before April 15, 1985, your Cash
> Deductible is $1.00).  It is the amount you have to pay for yourself or a
> Dependent each time a prescription is filled.  It applies to each prescription
> and each refill.

ECF 34-16 at p. 18.

3.      The language of this section reflects that the prescription copay benefit is a retirement

benefit.

---

[6] "This Certificate describes the Plan in effect as of February 1, 1987 for Active Employees, and Retired
Employees whose retirement commenced on or after February 1, 1978, whose employment is covered by Collective
Bargaining Agreements between the Employee and Local # 182, International Typographers Union."

[7] ECF 34-2, p. 18-19.

7

(5:09 CV 2193)

4.      The February 1, 1987 SPD also provides for the effect of retirement and Medicare

eligibility on the benefits described therein.

> The section entitled "When You Become A Retired Employee" provides that:

>> As a retired Employee, all coverage being continued as shown below is non-contributory.  This means that you do not have to make any contributions toward its cost.
>> ● Your Life Insurance will not stop.  However, it will be reduced. . . .
>> ● Your Vision Care Benefit will stop.
>> ● Your Dental Care Benefit will stop.
>> ● Your Major Medical Benefit will continue until you reach 65, or become a person eligible under Medicare, whichever first occurs.
>> ● Other Health Benefits will not stop.  They will continue for you and your Dependents.  They will be modified for any person who becomes eligible for Medicare.  See Effect of Medicare on the Plan for how this works.
>> . . . .

ECF 34-16 at p. 40.

5.      There is no section in the SBD entitled "Other Health Benefits" and it is not separately

defined.   According to the SPD, "Other Health Benefits will not stop.  They will continue for

you and your dependents. . . ."  The SPD sections "When You Become A Retired Employee,"

"Effect of Medicare on the Plan," and the sub-section "How Medicare Affects Other Benefits,"

specifically addresses certain benefits coverage but does not specifically address prescription

copay coverage.  To the extent the prescription copay benefit constitutes "Other Health

Benefits," the SPD provides that such benefits continue after retirement.

6.      Also contained in the February 1, 1987 SPD is a section entitled "When Coverage

Stops."  That section contains a subsection entitled "A Retired Employee" which refers to the

above-quoted section "When Your Become A Retired Employee" and provides as follows:

8

(5:09 CV 2193)

>The employer may continue coverage when you become a Retired Employee. Only the coverage shown in "When You Become A Retired Employee" will be continued.

ECF 34-16 at p. 55.

This loops the SPD review back to the prior section, "When You Become A Retired Employee," which is not a model of clarity regarding prescription copay benefits.

7.      The February 1, 1987 SPD concludes with the following language: "The employer retains the right to modify any benefits, increase or decrease deductibles or employee contributions, or to terminate the entire plan at any time."  ECF 34-16, p. 75.  The reservation of rights language does not specifically include retirees.

D.      <u>Early Retirement Programs</u>

1.      The Journal periodically offered early retirement programs to employees who were guaranteed lifetime employment under the CBAs.  The nature of these programs were determined by the Journal.  Retirement under these programs meant that plaintiff retirees gave up their right to guaranteed lifetime employment.

2.      Barbara Dean Thomas (Thomas) was the Journal's Employee Relations Director, who retired in 1995.  When the Journal decided to offer an early retirement program to certain employees with lifetime employment guarantees, Thomas met with those employees individually to explain their retirement benefits.  These meetings typically included discussions about compensation, insurance coverage, and prescription copay cards for the employees and their spouses.  ECF 36-5.

(5:09 CV 2193)

3.      Upon retirement, the employees received "retirement-benefit description letters" which reflected the benefits discussed with them.  It was Thomas' intention and the Journal's intention when delivering these letters that the retirees were to receive the precise benefits described and that these "guaranteed lifetime benefits" were provided as an incentive for employees to accept early retirement.  ECF 36-5.

4.      After Thomas retired, similar discussion took place with retirees, individually and/or in groups, with various Journal personnel, including Aaron Burr.

5.      Through their representatives, the Journal met with prospective retirees to provide information regarding the benefits they would receive upon retiring, and/or provided the prospective retirees with a draft letter describing their retirement benefits, and/or provided informational handouts in advance of their retirement.  The meetings, draft letters, and/or handouts variously addressed the lifetime prescription copay retirement benefit.  *See* West Depo. (ECF 36-1); Greene Decl. (ECF 36-12); Downing Depo. (ECF 36-2); Abbott Decl. (ECF 36-4); Thomas Decl. (ECF 36-5).

6.      The lifetime prescription copay benefit motivated plaintiffs to retire and give up their guaranteed lifetime employment.  *See eg.* "And I would never leave if I had known I wasn't going to get my prescription card."  West Depo., ECF 36-1, pp. 110-11,131 and ECF 4-6; Downing Depo., ECF 36-2, pp. 62-63 (prescription drug coverage was "main reason" decided to retire) and ECF 4-5; *see also* White Decl. (ECF 4-4); Abbott Decl. (ECF 36-4); Greene Decl. (ECF 36-12).

10

(5:09 CV 2193)

Retirement Benefits Letter

7.     Each plaintiff retiree received a letter describing their retirement benefits on or about the

day of their retirement.[8]  The benefits described in the letter reflects the benefits that were earlier

described by the Journal in group or individual meetings with prospective retirees, handouts,

and/or unsigned draft retirement benefits letters.[9]

8.     Examples of the retirement benefits letters contain the following typical language:[10]

> The purpose of this letter is to provide you with necessary information
> concerning the benefits you have upon your retirement from active service,
> effective [].
> . . . . .
> HOSPITALIZATION/MEDICAL
>
> Upon retirement your medical benefits, as an active staffer will terminate.
> Under the terms of the Voluntary Separation Program you and your spouse
> will be eligible to enroll in and receive the same medical benefits as active
> staffers until age 65 or Medicare eligible whichever comes first.  Your cost
> for medical benefits will be 20% of the company cost.
> . . . . .

---

[8] David White, ECF 34-7 ("Your Prescription Drug coverage will remain in effect for you and your wife for your lifetime."); Ruth West, ECF 4-2 ("Upon reaching age 65 medical benefit [sic] will terminate for your and your spouse individually.  However, you and your spouse will be eligible for a prescription drug card with a $5.00 co-pay for the remainder of your life."); Hugh Downing, ECF 34-9 ("Upon retirement, your medical benefits as an active staffer will terminate.  You will be eligible to enroll and receive the same medical benefits as active staffers for you and your wife individually until age 65 or Medicare eligible, whichever comes first.  At that time all medical benefits will terminate.  However, you and your spouse will be eligible for a prescription card with a $5.00 co-pau for the remainder of your life.")

[9] Ruth West testified at her deposition that Aaron Burr gave her a draft version of her retirement benefits letter and advised her to read the letter and "make sure it's correct, because this is the only thing that you'll have when you retire, and it's got to be correct. . . .What's in this letter is what you will have."  West Depo. (ECF 38, p. 27-28).  In Ruth West's case, the draft letter provided by Aaron Burr did not accurately reflect the retirement benefits previously described to her, and was subsequently corrected by Aaron Burr before the letter was signed by Burr and issued to Ruth West.  *Id.*

[10] *See* ECF 4-2.  Earlier letters of this type stated "Your Prescription Drug Coverage will remain in effect for you and your [spouse] for your lifetime."  ECF 36-5.  The SPD quoted, *infra*, provided for a $2.00 prescription drug copay.  Some very early retirees received a $1.00 prescription drug copay.

(5:09 CV 2193)

> Upon reaching age 65 medical benefits will terminate for you and your
> spouse individually.  However you and your spouse will be eligible for
> a prescription drug card with a $5.00 co-pay for the remainder of your life.

9.      While the letters vary as to the amount of the copay depending upon the time of

retirement,[11] the retirement benefits letters reference a prescription drug benefit for the lifetime

of the retiree and their spouse.

10.     Thomas, the Journal's employee relations director met with retirees and signed retirement

benefits letters before 1995.  Thomas and the Journal intended that the retirees would receive the

specific prescription drug benefit described in the retirement benefits letters.  The specific

benefit intended was that the retirees and their spouses would receive for their lifetime a co-pay

prescription card that would cover all prescriptions, including brand name, generic, preferred and

non-preferred drugs.[12]  ECF 36-5.

11.     Aaron Burr from the Journal's human resources department signed retirement benefit

letters on behalf of the Journal after Thomas' retirement.  *See* ECF 4-2; ECF 36-12.  Typical

language in the retirement letters signed by Aaron Burr is quoted, *supra*.[13]

---

[11] The copay varied from $2.00-$5.00.

[12] "It was my and the Journal's intention in signing and delivering these letters that the employees receive, in retirement, the precise benefits described in the letters.  It was the intention in David White's case, for example, that he and his spouse receive a $2 co-pay prescription card, good for David's lifetime, that would cover all prescriptions, including brand name and generics, preferred and non-preferred; and that he and his spouse would also receive a supplemental insurance benefit covering medical costs and expenses not reimbursed by Medicare.
        These guaranteed lifetime retirement benefits were provided as an incentive to entice employees, such as Mr. White, to accept an early retirement from the Journal.
        While I was employed at the Journal, it was the Journal's custom and practice for composing room Union employees, upon retirement, to take with them for their lifetimes, the prescription drug card benefit they had at the time of their retirement."  Thomas Decl., ECF 36-5.

[13] While Thomas stated in her declaration that the retirement health benefits contained in the letters were

(continued...)

12

(5:09 CV 2193)

12.     At the time Aaron Burr signed those letters on behalf of the Journal, he believed that the language of the retirement letter describing retiree benefits was true.  Burr Depo. (ECF 36-14, pp. 63-66).

13.     Notwithstanding Burr's later belief the retirement benefits language was a mistake, at the time Thomas and Burr advised plaintiff employees regarding their retirement benefits, it was their intention and belief that the benefits described in the letters were the specific benefits that the retirees would receive.

        Separation Agreement

14.     In addition to receiving the retirement benefits letters described above, retiring employees signed a Special Voluntary Retirement Program Election Form and/or Special Voluntary Retirement Plan.  These documents for each retiree are not identical.  Some do not address health care benefits.  ECF 34-4 (Downing).  Others state that retiree health benefits will be provided under the Knight Ridder Retiree Health and Welfare benefit plans or "the plan provided pursuant to your collective bargaining agreement" and specifically provide that some benefit programs will end on the employee's last active day, but do not include prescription copay coverage in the list of benefits that will end.  ECF 34-5 (West).

---

[13](...continued)
intended by the Journal to provide a guaranteed lifetime benefit, Aaron Burr testified at his deposition that the language in his retirement benefits letters was a mistake based on information he received from a predecessor, and that he now believes that the retirees were never entitled to receive a prescription copay card as a benefit, either upon retirement or upon reaching age 65.

13

(5:09 CV 2193)

E.     Prescription Copay Card

1.     The retirement benefits letters received by plaintiffs and provided to the Court describe a lifetime prescription copay benefit.

2.     Each year for many years - at least until 2003 - retirees received new prescription copay cards.  While the amount of a particular plaintiff's copay varied from $2 to $5 dollars depending upon when retirement was taken, the amount of the copay for individual retirees remained the same each year when the new prescription copay cards were issued.

3.     In 2003, the prescription copay for plaintiff retiree Ruth West was increased from $5 to $10 or $20.  The $5 copay remained in place only for generic drugs.  West Depo. (ECF 38, p. 12-13).

4.     The plaintiffs received no correspondence from the Journal regarding this change.[14] When Ruth West questioned the change, she testified that the Journal told her that until age 65 she would receive the same prescription copay benefits as other employees received, and that the $5 copay would apply at age 65.  *Id.*[15]

F.     2006 Letters from Journal Regarding Retiree Benefits

1.     Around November 2006, plaintiff retirees received a letter from the Journal notifying them that, effective February 1, 2007, the current prescription plan administered by United Healthcare would "be replaced" with a Medicare Part D Plan administered by Aetna.  Under the new plan, the retirees could purchase generic drugs for $5.00, preferred drugs for $20.00, and

---

[14] *See* West Depo, at p. 16.

[15] When asked by the Court at the preliminary injunction hearing why this change took place in 2003, defendants' counsel replied that the defendants cannot determine why that change was made.

14

(5:09 CV 2193)

non-preferred drugs for $40.00.  *See* ECF 4-3 (Letter dated November 27, 2006 addressed to John Costello).

2.      As a consequence of this change, retired employees have been required to pay more for prescription drugs, experienced difficulty obtaining health care and medication, and/or done without health care and medication.  *See* ECF 4-5, 4-6, 4-7.

G.      Impact of Journal's November 2006 Letters Regarding Retirement Benefits

1.      As a consequence of the alterations to the plaintiffs' retiree health care benefits, plaintiffs have experienced the inability to obtain needed medication because of the increased cost of prescriptions and have experienced difficulty in securing medical care from providers who do not accept plaintiffs' altered insurance.   *See* White Decl. (ECF 4-4); Downing Decl. (ECF 4-5); West Decl. (ECF 4-6).

## II.  APPLICABLE LEGAL STANDARD AND CONCLUSIONS OF LAW

Rule 65 of the Federal Rules of Civil Procedure provides the Court with discretionary authority to issue a preliminary injunction.  The purpose of a preliminary injunction is to preserve the parties' relative positions until a determination on the merits of the case can be made.  Consequently, a preliminary injunction is customarily granted on less formal and complete evidence than is required in a trial on the merits and plaintiffs are not required to prove their case in full at the preliminary injunction stage of a lawsuit.  *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.,* 511 F.3d 535, 542 (6th Cir. 2007).  Further, the findings of fact and conclusions of law made by the a court when granting a preliminary injunction are not binding at the trial on the merits.  *Id.*

15

(5:09 CV 2193)

There are four factors that a court must balance when considering a motion for preliminary injunction: 1) whether the movant has a strong likelihood of success on the merits; 2) whether the movant will suffer irreparable injury without the injunction; 3) whether issuance of the injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuance of the injunction.  These four factors are considerations to be balanced and not individual prerequisites which must be met.  *Certified Restoration Dry Cleaning Network,* 511 F.3d at 542.

The burden is on the moving party to establish that injunctive relief is warranted. Plaintiffs argue that defendants have terminated their vested retiree health benefits, in particular their prescription copay benefit, and that this change has negatively impacted plaintiffs' ability to obtain medical care and has harmed their health.  Defendants contend that the plaintiffs' prescription copay benefits were not vested, and therefore can be modified or terminated.

The point of contention between the parties is the vesting status of their retirement healthcare benefits, in particular, the prescription copay benefit.  Plaintiffs contend that these benefits are vested and cannot be changed or terminated by the Journal.  Defendants' position is that the Journal's continuous provision of prescription copay benefits to retirees over the years was gratuitous, but that the benefits are not vested, and therefore, can be changed or terminated by the Journal.

16

(5:09 CV 2193)

A.  Likelihood of Success on the Merits

Plaintiffs must demonstrate a likelihood of success on the merits in order to prevail on their motion for preliminary injunction.[16]  "In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success.  However, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for litigation and thus for more deliberate investigation."  *Six Clinics Holding Corp., v. Cafcomp Systems, Inc.,* 119 F.3d 393, 402 (6th Cir. 1997) (internal citations omitted).  However, this factor is but one of four to be balanced by the Court, and even a finding that the movant has not established a strong likelihood of success on the merits does not preclude the Court from granting injunctive relief if the movant has shown "serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued."  *Six Clinics Holding Corp., v. Cafcomp Systems, Inc.,* 119 F.3d at 399-400 (internal quotations omitted).

1.  Vested Retiree Health Benefits

Plaintiffs allege that the parties' CBAs provide vested retiree healthcare benefits and that defendants violated the LMRA by terminating/modifying those benefits.  Plaintiffs also claim that defendants violated ERISA by breaching their fiduciary duty to plaintiffs to provide retiree healthcare benefits.  The critical question in the LMRA and ERISA analysis of likelihood of success on the merits is whether plaintiffs' retiree health benefits are vested.

---

[16] Plaintiffs' amended complaint advances multiple theories of recovery.  However, the Court need not determine likelihood of success on the merits for each theory in order to satisfy this factor for the purposes of preliminary injunction analysis.

17

(5:09 CV 2193)

Retiree health benefit plans, unlike pension plans, are not subject to mandatory vesting. *Cole v. Arvinmeritor, Inc.*, 549 F.3d 1064, 1069 (6th Cir. 2008)(citing *Noe v. PolyOne Corp.,* 520 F.3d 548, 552 (6th Cir. 2008)).  However, the Sixth Circuit in *UAW v. Yard-Man, Inc.*[17] recognized that parties to collective bargaining agreements can agree to vest retiree health insurance benefits, thereby creating benefits that survive termination of the agreement.  *Yard-Man,* 716 F.2d  at 1479.  "A court may find vested rights under a CBA even if the intent to vest has not been explicitly set out in the agreement."  *Cole v. Arvinmeritor, Inc.*, 549 F.3d at1069 (internal quotations omitted)(quoting *Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 915 (6th Cir. 2000)).

Vesting means that the benefits cannot be altered for the lifetime of the beneficiary.[18] *Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998)(en banc)("To vest benefits is to render them forever unalterable.").  If retiree health insurance benefits are not vested, however, then the employer may terminate or modify those benefits upon expiration of the collective bargaining agreement that provided those benefits. *Yolton v. El Paso Tennessee Pipeline Co.,* 435 F.3d 571, 578 (6th Cir. 2006).[19]

---

[17] 716 F.2d 1476 (6th Cir. 1983).

[18] In some cases, the beneficiary is also the surviving spouse of the retiree.

[19] The *Yard-Man* vesting analysis applies not only to situations in which the employer eliminates retiree health benefits entirely, but also to situations in which the benefits are diminished or limited by the employer. *Cates v. Cooper Tire & Rubber Co.,* 555 F. Supp. 2d 878, 885, fn. 5 (N.D. Ohio 2008) ("The Sixth Circuit has affirmed that *Yard-Man* is not only appropriate where the employer terminates benefits, but also where an employer places additional limitations on previously vested benefits." (citing *Int'l Union v. Loral,* 1997 WL 49007, *1)).

18

(5:09 CV 2193)

When retiree benefits are vested, the beneficiary continues to receive the benefits in the collective bargaining agreement in effect when s/he retired for the life of the retiree and, in certain circumstances, for the life of the surviving spouse.  *Yolton,* 435 F.3d at 581 ("the retirement package available to someone contemplating retirement will change with the expiration and adoption of CBA's, but someone already retired under a particular CBA continues to receive the benefits provided therein despite the expiration of the agreement itself").  If this were not the case, retiree benefits "would be left to the contingencies of future negotiations." *Yard-Man,* 716 F.2d at 1482.

Whether retiree health insurance benefits are vested depends upon the intent of the parties.  *Yard-Man* and its progeny set out the guiding principles in the Sixth Circuit for determining whether parties to collective bargaining agreements intended retiree health insurance benefits to vest.[20]  In determining whether the parties to a collective bargaining agreement intended retiree  health benefits to vest, the basic rules of contract interpretation apply.[21]  If a contract is clear and unambiguous, the parties' intent should be determined from the plain language of the contract and the Court should not use extrinsic evidence to discern intent. *Cates v. Cooper Tire & Rubber Co.,* 555 F. Supp. 2d 878, 885, fn. 5 (citing *Royal Ins. Co. of.*

---

[20] "With regard to the so-called "*Yard-Man* inference," later decisions of [the Sixth Circuit] have stated that *Yard-Man* does not create a legal presumption that retiree benefits are vested for life. . . . *Yard-Man* is instead properly understood as creating such an inference only if the context and other available evidence indicate an intent to vest." "  *Cole v. Arvinmeritor, Inc.*, 549 F.3d at1069 (internal citations and quotations omitted.

[21] "The enforcement and interpretation of collective bargaining agreements under § 301 is governed by substantive federal law.  However, traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies.  Many of the basis principles of contractual interpretation are fully appropriate for discerning the parties' intent in collective bargaining agreements."  *Maurer v. Joy Tech., Inc.*, 212 F.3d at 914-15 (quoting *Yard-Man* at 1479-80).

(5:09 CV 2193)

*Amer. v. Orient Overseas Container Line, Ltd.,* 514 F.3d 621, 634 (6th Cir. 2008)).  However,

when the CBA is ambiguous, the Court may examine extrinsic evidence to determine whether

the parties intended the retirees' health benefits to survive the expiration of the CBA.  *Cole v.*

*Arvinmeritor, Inc.*, 549 F.3d at 1070 (citing *Int'l Union, United Auto. Aerospace & Agric.*

*Implement Workers of Am. v. BVR Liquidating, Inc.,* 190 F.3d 768, 774 (6th Cir. 1999)).

Therefore, the Court must first examine the language of the applicable collective

bargaining agreement for clear manifestations of an intent to vest. *Noe,* 520 F.3d at 552 (citing

*Yard-Man* at 1479).  Each provision of the collective bargaining agreement is to be construed

consistently with the entire agreement and the "relative positions and purposes of the parties."

*Id.* (internal citations omitted).  The terms of the collective bargaining agreement "should be

interpreted so as to avoid illusory promises and superfluous provisions."  *Noe,* 520 F.3d at 552

(citing *Yard-Man,* 716 F.2d at 1480).

The Sixth Circuit has repeatedly held that "language in an agreement that ties eligibility

for retiree health benefits to eligibility for a pension indicates an intent to vest the health

benefits."  *Noe,* 520 F.3d at 558 (internal citations omitted).  Because retirees receive pension

benefits for life, tying health insurance benefits to pension benefits demonstrates an intent to

provide lifetime health benefits, as well. *Yolton*, 435 F.3d at 580.   The CBAs in this case link

retirement health benefits to pension status, thus indicating an intent to vest.  However, the

CBA's do not delineate the specifics of the retirement health benefits provided or to which

benefits, if any, durational limits may apply.

20

(5:09 CV 2193)

The Court concludes that language of the CBA is ambiguous as to the vesting of retiree health benefits, and therefore requires examination of extrinsic evidence.  In this case there are several items of extrinsic evidence for examination by the Court to ascertain the parties' intent to vest retiree health benefits.

The first is the SPD.  In the SPD, the prescription copay benefit is set forth as a health benefit separate from vision, dental, hospital, life insurance, and major medical.  The SPD section entitled "When You Become A Retired Employee" specifically addresses life insurance, vision, dental and major medical, but not the prescription copay benefit.  However, this section does provide for "other health benefits."  That language provides that upon retirement plaintiffs' "other health benefits . . .  will not stop.  They will continue for you and your Dependents" subject to the section of the SPD regarding the "Effect of Medicare," which does not address prescription copay coverage.

Second, plaintiff retirees testified that they were informed by the Journal in meetings with Journal representatives, in writing or both, that prescription copay benefits for the retirees and their spouse were provided for life.  These representations regarding lifetime prescription copay coverage were provided in advance of plaintiffs' decision to give up their lifetime job security and were material to their decision to retire.

Third, the retirement benefits letters issued to plaintiff retirees reflect that the prescription copay benefits for the plaintiff retirees and their spouses were for life.  The language of the retirement benefits letters reflected the information they received from the Journal in advance of their retirement decision.

21

(5:09 CV 2193)

Fourth, the declaration of Thomas, the Journal's Employee Relations Director who retired in 1995, states that it was the Journal's intention that the specific benefits outlined in the retirement benefits letters were guaranteed lifetime benefits.  One of Thomas' successors, Aaron Burr also met with prospective retirees and issued retirement benefits letters.  Like Thomas, it was Burr's belief at the time the letters were issues that the specific benefits outlined in the retirement letters were guaranteed lifetime benefits.[22]

Lastly, each year for a number of years, the retirees received new prescription copay cards.[23]

These items of extrinsic evidence, considered in conjunction with the language of the CBA, weighs in favor of plaintiffs' position that the defendants' intended to provide vested retiree health benefits.  Further, general reservation of rights language which does not specifically apply to retirees may function to inform current employees that the retirement benefits available now may not be available at the time they retire, but is not effective as to employees who have already retired under a particular plan.  Accordingly, the Court concludes that plaintiffs' likelihood of success on the merits weighs in favor plaintiffs' motion for injunctive relief.

---

[22] Burr claims that he subsequently discovered he was mistaken in this understanding.

[23] Defendants' position is that the annual reissuing of plaintiffs' prescription copay cards was gratuitous.  A change occurred in 2003 which defendants cannot now explain.  Even if retirees tolerated a modification in 2003, they are not barred from now claiming that those benefits are vested.  *Reese v. CNH Global,* 2007 WL 2484989 (E.D. Mich.) at *6.
  In 2006, the Journal took the position that the plaintiffs' retiree health benefits were not vested and informed the retirees alterations to those benefits.

(5:09 CV 2193)

      2.     <u>Equitable Estoppel</u>

Plaintiffs also contend that defendants are equitably estopped from modifying those benefits. While the Court has determined that plaintiffs are likely to succeed on their claim that retiree health benefits are vested, the analysis of the language of the CBAs and extrinsic evidence reflects that the language is not a model of clarity, and arguably ambiguous.

The Court has found that the Journal intended to provide retiree plaintiffs with the specific benefits that were outlined in their retirement benefits letters. These benefits were offered to employees with guaranteed lifetime employment to induce them to waive their lifetime employment rights and retire. The information contained in the retirement benefits letters was provided to plaintiffs before they retired through individual and group meetings and/or documentation. The Journal intended to induce plaintiffs to make a decision to retire based on the retirement benefits offered and that in making that decision, plaintiffs were relying on the information provided regarding retirement benefits in making that decision.

The elements of an estoppel claim are as follows:

1) conduct or language amounting to a representation of a material fact;

2) the party to be estopped must be aware of the true facts;

3) the party to be estopped must intend the representation be acted upon;

4) the party asserting estoppel must be unaware of the true facts; and

5) the party asserting estoppel must reasonably or justifiably rely on the representation to his detriment.

*See Bertram v. NuTone, Inc.,* 107 F. Supp. 2d 957, 968 (S.D. Ohio 2000).

23

(5:09 CV 2193)

In this case, the Court finds that each necessary element of an equitable estoppel claim is present in these facts.  The Journal represented to plaintiff retirees that they and their spouses would have lifetime prescription copay benefits.  The Journal's purpose in offering such a benefit was to induce plaintiffs to retire, and was material and intended by the Journal to be acted upon.  This material representation was an important consideration in retiree plaintiffs' decision to give up their right to lifetime employment.[24]  Defendants argue vigorously that the plaintiff retirees' benefits are not vested, and therefore, were presumably aware that the information and documentation provided to plaintiff retirees regarding lifetime prescription copays were, in defendants' view, not true.  While it is the defendants' position that these benefits are not vested, the underlying documentation that forms the bases for that position is not unambiguous, and the guarantees received by plaintiffs directly from the Journal were not obviously inconsistent with the CBAs and SPD, therefore supporting a conclusion that plaintiffs reasonably relied upon defendants' material representations.  Plaintiffs' reliance on defendants' representations to plaintiffs in advance of their decision to retire was confirmed by the contents of the retirement benefits letters provided to plaintiffs at the time of their retirement, which unambiguously state that plaintiffs would receive lifetime prescription copay benefits.  Plaintiffs relied on the retirement information provided by defendants to their detriment in their decision to retire.  For these reasons, the Court concludes that plaintiffs are entitle to rely on their retirement benefits letters and likely to succeed on their estoppel claim.

---

[24] "And I would never leave if I had know I wasn't going to get my prescription card."  West Depo., ECF 36-1, pp. 110-11,131 and ECF 406; Downing Depo., ECF 36-2, pp. 62-63 (prescription drug coverage was "main reason" decided to retire) and ECF 4-5; *see also* White Decl. (ECF 4-4); Abbott Decl. (ECF 36-4); Greene Dec. (ECF 36-12).

(5:09 CV 2193)

B.    Irreparable Harm

The second factor in the Court's analysis regarding injunctive relief is irreparable harm.

A harm to plaintiff is considered irreparable if it cannot be fully compensated by money.

*Langley v. Prudential Mortg. Capital Co., LLC,* 554 F.3d 647, 649 (6th Cir. 2009)(quoting

*Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir. 1992)).

In this case, the Court finds that plaintiffs are unable to obtain adequate health care

because of the increased cost of prescriptions and/or because of difficulty in securing medical

care from providers who do not accept plaintiffs' new insurance.  Inability to obtain proper

medical services constitutes irreparable harm, and the Court finds that this factor weighs in favor

of granting plaintiffs' request for preliminary injunction.  *See Detroit Medical Center v. GEAC*

*Computing Systems, Inc.,* 103 F. Supp. 2d 1019, 1023-24 (E.D. Mich 2000)(interruptions in

computer support services could effect plaintiff's ability to provide proper health care to

patients); *United Steel Workers of America, AFL-CIO v. Fort Pitt Steel Casting,* 598 F.2d 1273,

1280 (3rd Cir. 1979)(possibility that a worker would be denied adequate medical care constitutes

substantial and irreparable injury).[25]

---

[25] Defendant contends that plaintiffs' delay in seeking injunctive relief after receiving defendants' letter changing/terminating benefits in November 2006 weighs against irreparable harm.  However, a delay is not unreasonable when a plaintiff is not unduly dilatory, investigated his claim, and did not sleep on his rights.  *Forry, Inc. v. Neundorfer, Inc.,* 837 F.2d 259, 267 (6th Cir. 1988).

Although plaintiffs may not have brought this suit as quickly as they might have, they did seek to correct the matter with defendants. ("I kept bothering the Beacon Journal. . . . I would call Karen, or if Aaron was there, I'd talk to one of them and say. 'Why don't I have my five-dollar copay for life?' I mean, every time I'd call, I'd ask them. . . Oh, probably every couple, three months. . . .They'd say, 'Don't worry about it.  You'll get it when you're 65.'" West Depo., ECF 36-1, pp. 40-42).

In light of plaintiffs' timely direct challenge to the Beacon regarding prescription copays, the Court concludes that any delay in bringing this litigation is not sufficient to lead to an inference that there is no irreparable harm.  "To find otherwise would discourage parties from fully exploring whether their disputes could be resolved

(continued...)

(5:09 CV 2193)

C.    Harm to Others and Public Interest

The last two factors to be considered in analyzing plaintiffs' request for preliminary injunction is substantial harm to others and the effect on the public should the Court grant injunctive relief.  The harm to defendants would be a more expensive retiree health care program, which is likely the underlying reason defendants seek to change or eliminate the retiree prescription copay program.  However, the Court finds that in balancing the potential harm to plaintiffs of permanent damage to their heath outweighs the harm to defendants to implement injunctive relief.

Further, the public has an interest in the protection of employees' rights in welfare benefit plans and in the enforcement of federal laws and court decisions which safeguard those rights.  Accordingly, the public interest weighs in favor of injunctive relief.

D.    Bond

Rule 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined . . .."  Whether to require a bond before granting preliminary injunction is not mandatory, but discretionary with the Court. *NACCO Materials Handling Group, Inc. v. Toyota Materials Handling USA, Inc.,* 246 Fed. Appx. 929, 953-53 (6th Cir. 2007) (citing *Roth v. Bank of the Commonwealth,* 583 F. 2d 527, 538 (6th Cir. 1978)).

---

[25](...continued)
without resorting to litigation."  *See Warrior Sports, Inc. v. National Collegiate Athletic Ass'n*, 2009 WL 230562 (E.D. Mich 2009).

(5:09 CV 2193)

The Court has considered the need for a bond to be posted in advance of preliminary injunction.  In this case, the Court has been provided with declarations from plaintiffs that the increased costs of their prescription copays resulting from the Journal's alteration of retiree health benefits has prevented plaintiffs from securing needed medication and medical care.  The requirement of a bond in this case would replace their existing financial burden of increased medical costs with another substantial financial burden.

Further, until recently, defendants have borne the costs of the retiree health benefits as described in plaintiffs' retirement benefits letters.  Implementation of the injunction will return defendants' costs to the status quo before the reduction of benefits in February 2007, not impose additional costs.

Lastly, the Court has concluded that the public interest factor in the preliminary injunction analysis weighs in favor of plaintiffs because the public has an interest in the protection of employee rights under ERISA and the LMRA.  The imposition of a bond on individual employees may chill employees' ability to enforce their rights in these areas, therefore defeating the public's interest in the protection of those rights.

Accordingly, after due consideration, the Court finds that imposition of a bond is not appropriate in this case and exercises its discretion to grant the plaintiffs' motion for preliminary injunction without the requirement of a bond.

(5:09 CV 2193)

### III.  CONCLUSION

For the reasons contained herein, the Court concludes that plaintiffs' likelihood of success on the merits, harm to plaintiffs' health, and the public interest in the enforcement of CBAs and ERISA plans is outweighed by any harm to defendant.  Accordingly, the Court finds that plaintiffs David and Regina White, Hugh and Sharon Downing, Ruth and Thomas West, Robert Abbott, Robert Walker, Larnie and Stephanie Greene, Ora and Shirley Thombs, and Raymond and Amaryllis Wolf, have demonstrated that they are entitled to the entry of a preliminary injunction.

Plaintiffs' motion for a preliminary injunction is GRANTED as to the named plaintiffs in this case.

Pending final resolution of this matter, defendants are ordered to: 1) immediately restore and provide all prescription-drug and/or health insurance benefits as described in the individual retirement benefits letters received by retiree plaintiffs at the time of their retirement for the retirees and their spouses; and 2) upon presentation of receipts or other evidence of prescription-drug or other healthcare-related expenditures for which a benefit is described in plaintiffs' individual retirement benefits letters, provide reimbursement to plaintiffs for the difference between the sums paid by individual plaintiffs and the sums the individual plaintiffs would have

(5:09 CV 2193)

been required to pay had the benefits in plaintiffs retirement benefits letters been provided as

described therein.[26]


      IT IS SO ORDERED.


  May 13, 2010                          *s/ David D. Dowd, Jr.*
Date                                 David D. Dowd, Jr.
                                     U.S. District Judge

---

[26] This injunction may be extended to include class members if and when a class is certified.

29